**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

John Doe I and John Doe II,     )
                                     )
                 Plaintiffs,    )  Case No. 1:15-CV-681
                                       )
      vs.                             )
                                       )
University of Cincinnati, <u>et al.</u>,    )
                                       )
                                       )
               Defendants.    )

**O R D E R**

This matter is before the Court on the motion to dismiss filed by Defendants University of Cincinnati, Daniel Cummins, Denine M. Rocco, and Debra Merchant.  Doc. No. 11.  For the reasons that follow, Defendants' motion to dismiss is well-taken and is **GRANTED**.

## I. <u>Background</u>

Plaintiffs John Doe I and John Doe II were charged in separate incidents with violating the University of Cincinnati's ("UC") Student Code of Conduct by sexually assaulting a female student.  After hearings before the Administrative Review Committee ("ARC"), Doe I and Doe II were found "responsible" for the charged violation.  Doe I received a three-year suspension but ultimately transferred to another educational institution.  Doe II was placed on disciplinary probation and banned from several buildings on campus for a one-year period.  Doe II was also required to submit a seven-page research paper.  Doe II, however, was allowed to remain enrolled in school; he completed his post-graduate degree and has graduated from UC.

1

Doe I and Doe II claim that the ARC hearing procedures were grossly inadequate to protect their right to due process. Doe I and Doe II also allege that where claims of sexual assault are concerned, the ARC hearing procedures are skewed in favor of the female complainant and against the male respondent with the purpose of producing outcomes allegedly favored by the U.S. Department of Education so as to preserve UC's federal funding. Doe I and Doe II allege, therefore, that Defendants have violated their right to due process and have discriminated against them on the basis of gender in violation of Title IX of the Education Amendments Act of 1972.

For purposes of the instant motion to dismiss, the Court accepts the following facts from the complaint as being true.

A. <u>John Doe I</u>

In March 2014, Doe I was a junior at UC's Blue Ash campus. On March 9, 2014, Doe I left a party held near campus with Jane Roe I and Jane Roe II. Doe I went with Roe I and Roe II to their dormitory room at Daniels Hall. Doe I claims that Roe I and Roe II were intoxicated and had been smoking marijuana. Roe I claimed that she fell asleep and awoke to find Doe I attempting to have sexual intercourse with her. Roe I claimed that she told Doe I "no" and then fled the room. Doe I then allegedly got into bed with Roe II and had intercourse with her while she was passed out. Doe I denies that he sexually assaulted Roe I and Roe II.

Doe I claims that Roe I and Roe II gave inconsistent statements about this incident to UC administrative officials and to the UC Police. For instance, Doe I alleges that Roe I gave inconsistent statements about whether she had smoked marijuana that night. Additionally, Roe I told the UC police that she changed clothes in front of Doe I and then

Doe I got into bed with her but later gave a statement saying that she fell asleep and awoke to find Doe I on top of her.  Roe II allegedly denied being intoxicated in her complaint to UC but later stated that she could not remember significant events before she passed out.  Roe II also told the UC Police that she rated her intoxication level as "8 of 10." Additionally, Roe II allegedly gave inconsistent statements about whether she passed out before or after Doe I penetrated her.

Doe I claims that he cooperated with the police investigation and that there was substantial evidence that exonerated him.  For instance, despite Roe I's claim that she did not know how Doe I got into her dormitory, and Roe II's claim that dormitory staff let Doe I into the building even though he did not have identification, security camera video shows that Roe I waited while Roe II signed Doe I into the dorm.  Additionally, although Roe II said during the ARC hearing that she had passed out and did not remember walking back to the dorm because she was "so high and intoxicated," neither Roe I nor Roe II appear intoxicated in the surveillance video.  Additionally, forensic evidence showed that Roe I and Roe II sent text messages during the time they supposedly were passed out.  In later messages, they joked about the case.  Another female student who was present at the time denied witnessing any illegal conduct.  Doe I believes that rape kits submitted to the crime lab for analysis support his version of the events.

Doe I alleges that high-placed UC officials tried to interfere with the criminal investigation.  An email from the UC Police Chief to UC's general counsel expressed concern that "we are allowed to conduct a thorough and complete investigation without any appearance of influence."  Complaint ¶ 58(a) (emphasis in original omitted).  Doe I also

alleges that UC detectives became frustrated that the UC's general counsel was trying to steer, obstruct, and impede their investigation.

Doe I alleges that Defendant Dan Cummins, who is UC's Assistant Dean of Students and Director of the Office of Judicial Affairs, instituted disciplinary proceedings against him without investigating whether the allegations of sexual assault against him were credible. Cummins notified Doe I of the charges by letter on March 12, 2014. Cummins and Doe I had an in-person meeting on March 28, 2014 to discuss the allegations.  Doe I denied the allegations but otherwise exercised his right to remain silent.  Cummins asked Doe I to sign a form stating that he had received the evidence supporting the allegation although he was not actually provided with any evidence during the meeting.

Cummins scheduled an ARC disciplinary hearing before actually interviewing any witnesses.  Cummins initially scheduled the hearing for April 7, 2014 but later moved it to May 2, 2014.  On April 28, 2014, Cummins issued a written report finding as a "fact" that Doe I had engaged in sexual activity with Roe I and Roe II without their consent.  Doe I claims that Cummins's report had a number of significant omissions:

1. It did not include a review of any of the physical evidence obtained by UC police.

2. It did not include Doe I's statements to the UC police.

3. It did not include a statement from an Ohio University student who witnessed Roe I and Roe II being "pretty flirtatious" with Doe I and said that Roe I and Roe II "basically dragged" Doe I back to their dorm.

4. Cummins did not attempt to obtain from the UC Police any evidence that tended to exonerate him, such as the surveillance tape and text messages.

Doe I claims that UC made no attempt to provide an impartial hearing panel and that the hearing convened on May 2, 2014 was a "kangaroo court."  Doe I alleges, for instance,

4

that prior to the hearing, committee member Carol Tong-Mack had been copied on emails requesting academic accommodations for Roe I because she "had recently been the victim of a crime." Roe I also copied Tong-Mack on an email to another professor in which she stated that she had been sexually assaulted in her dorm room. Doe I alleges that after receiving these emails, it was inappropriate for Tong-Mack to remain on the hearing panel.

Doe I claims that Cummins and/or UC denied him of a number of procedural protections during the ARC hearing:

1. UC never responded to requests from Doe I's attorney to have the UC police investigator present at the hearing.

2. UC only provided Doe I a heavily redacted copy of the investigative file.

3. UC did not provide the results of the rape kit analysis or of the SANE examinations.[1]

4. Cummins did not allow Doe I to record the hearing.

5. The hearing committee chair would not permit Doe I to impeach a witness, Roe I's boyfriend, who lacked firsthand knowledge of the incident.

6. The hearing committee chair did not permit Doe I to show the surveillance video.

7. The hearing committee chair would not accept the UC police report into evidence.

8. The hearing committee chair would not accept the text messages into evidence.

9. The hearing committee chair would not accept the rape kit analysis or the SANE examinations into evidence.

10. The hearing committee chair refused to ask witnesses written questions submitted by Doe I.

---

[1] A sexual assault nurse examiner, or SANE, "is a registered nurse that has special training to conduct sexual assault examinations on children and adults." McCormick v. Parker, 571 Fed. Appx. 683, 685 n.1 (10th Cir. 2014).

11. The hearing committee chair refused Doe I's request to obtain the presence of the UC police officers.

12. The hearing committee refused to consider a binder of evidence Doe I submitted on his behalf.

Doe I alleges on information and belief that Cummins orchestrated the hearing committee's actions since the hearing committee chair left the room on a number of occasions, stating that he had to consult with Cummins. The ARC committee found that Doe I violated the Student Code of Conduct with respect to one of the students. Doe I states that he left before the conclusion of the hearing regarding the second student since it was clear to him that he would not be afforded due process.

Less than a week later, UC determined that substantial procedural errors had occurred during Doe I's hearing and ordered that a new hearing take place. The new hearing was held on May 18-19, 2015. While not a "kangaroo court," Doe I alleges that he was still denied significant procedural protections during the second hearing:

1. The hearing committee considered Cummins's alleged biased investigative report.

2. The hearing committee was never advised that the complainant had the burden of proof and that Doe I was innocent until proven guilty.

3. The hearing committee refused to ask the complainants a number of written questions submitted by Doe I designed to highlight inconsistencies in their statements and to discover the extent of their alcohol and drug use on the night in question.

4. UC denied Doe I permission to make his own recording of the hearing.

5. UC failed to provide him with the assistance of a university advocate to the same extent as the complainants.

6. The hearing committee heard "impact statements" from the complainants before determining whether Doe I was guilty of violating the Student Code of Conduct.

6

7. UC failed to provide Doe I with clarification of the rules of evidence that would be utilized during the hearing.

8. UC failed to provide the hearing committee with information concerning the academic accommodations extended to the complainants.  Doe I contends that such information might have affected the committee's assessment of their credibility.

The hearing committee found Doe I "responsible" for violating the Code of Conduct with regard to Roe II but "not responsible" for a violation regarding Roe I.  The University Appeal Administrator rejected Doe I's appeal, including Doe I's contention that the panel erroneously assigned the burden of proof and/or failed to afford him the presumption of innocence.  Specifically, the Appeal Administrator wrote, "Neither party has the burden of proof.  Instead, the ARC uses the hearing to investigate what happened and then makes a finding based on a preponderance of the evidence."  Complaint ¶ 81(b).  Defendant Rocco affirmed this decision.  Because the ARC's decision was affirmed, Doe I now faces a three-year suspension from UC.

## B. John Doe II

Doe II is a former law student at UC.  He has graduated from the law school.  In March 2014, Defendant Cummins apparently received a complaint from Jane Roe III that she had been sexually assaulted by Doe II at an off-campus location.  Cummins filed a report with the UC Police, allegedly against Roe III's wishes, and then sent Doe II a notice that he had been accused of violating the Student Code of Conduct.  When Doe II protested that the alleged incident occurred outside of the jurisdictional bounds of the Code of Conduct - within 2,600 feet of campus - Cummins invoked a provision of the Code in which UC will assert jurisdiction over incidents outside of the 2,600 foot radius "when the student, in the university's sole judgment, poses an obvious threat of serious harm to any

member of the university community."  Complaint ¶ 87. Doe II's allegations otherwise are similar to Doe I's allegations.

Doe II complains that UC extended accommodations to Roe III and otherwise pre-judged his guilt on the complaint by treating her as a victim.  For instance, the complaint notes, Cummins contacted Roe III's thesis advisor to request accommodations for her because she "has recently been the victim of behavior that violates our sexual harassment policy."  Cummins allegedly sent this email before he notified Doe II of the allegations.  UC also provided Roe III with a job at the UC Women's Center.  Additionally, UC banned Doe II from entering a number of campus buildings based solely on the allegation that he had violated the Code of Conduct.  Finally, Cummins allegedly prepared a report on the alleged incident without conducting any investigation into the matter and then denied Doe II access to his report.

Cummins ultimately scheduled Doe II's ARC hearing for April 22, 2014.  Doe II's advisor, however, had a conflict with that date but Cummins refused to reschedule the hearing.  As a result, Doe II's advisor had to leave the hearing early.

Doe II claims that the ARC panel committed a number of other alleged procedural errors:

1. The panel heard a victim impact statement before determining whether a violation had occurred.

2. The panel did not apply the definition of consent provided by UC's Title IX policy.

3. The panel permitted a witness to make legal conclusions, such as that Doe II had "raped" Roe III and "assaulted" her.

4. Panel members pre-judged the conclusion as indicated by the notes they took during the hearing.

8

5. The panel did not have adequate definitions of "consent" and "intoxication" and did not provide Doe II an adequate opportunity to prepare for a claim of nonconsensual sexual contact due to intoxication.

6. The panel permitted the complainant to argue that Doe II did not obtain consent through each stage of the encounter although the Code of Conduct does not explicitly impose that requirement.

7. Doe II was not permitted to effectively cross-examine witnesses because questions had to be submitted in writing and no follow-up was possible.

8. Doe II was not given effective assistance of an attorney or advisor because the advisor was not permitted to participate in the hearing.

9. The panel relied on unreliable hearsay testimony.

10. Roe III claimed during the hearing that she was too intoxicated to consent but the panel did not receive any evidence to show that she was "physically incapacitated such that the person cannot understand the fact, nature, or extent of the sexual situation."

The panel found Doe II guilty of violating the Code of Conduct.  However, like Doe I, Doe II's appeal was sustained and he was granted a new hearing.  The second hearing took place in October 2014.  According Doe II, the second hearing was infected with many if not most of the procedural defects of his first hearing.  In addition, however, during her impact statement, Roe III told Doe II that he was a "rapist" and that he "was going to Hell." Roe III then called the proceeding  "a joke" and "stormed out of the hearing."  Thus, Doe II was unable to cross-examine her.

The panel again found Doe II guilty of violating the Student Code of Conduct.  He was not permitted to appeal this decision.  As stated above, Doe II was placed on disciplinary probation and required to complete and submit a seven-page research paper. Although Doe II has since graduated from UC, he states that he "may" have difficulty

obtaining employment due to the finding of responsibility. Additionally, Doe II fears that his disciplinary record may affect his eligibility to become an attorney in other states.

### C. Alleged Gender Discrimination

Plaintiffs both allege that UC's disciplinary system, insofar as it concerns claims of sexual assault, is rigged against male students accused of sexual misconduct. Plaintiffs contend that UC's handling of sexual assault complaints is influenced by a "Dear Colleagues" letter issued by the Department of Education. According to the complaint, the Dear Colleagues letter caused colleges and universities to reduce the procedural protections previously afforded to students accused of sexual misconduct because of an implicit or explicit threat of a federal investigation into institutions who fail to comply with the requirements of the letter as well as the loss of federal funding. Additionally, Plaintiffs allege that the training on sexual assault provided to UC's faculty and staff causes them to be biased against males accused of sexual misconduct and predisposes them to finding males guilty of misconduct. Plaintiffs allege that their allegations are supported by statistics showing that "it is nearly impossible for a student to be found not responsible."

### II. The Parties and the Claims

### A. The Parties

As indicated above, the Plaintiffs are John Doe I and John Doe II. John Doe I was a junior at UC's Blue Ash campus but transferred to another institution after he was suspended from UC. John Doe II was a law student who has graduated from UC since the imposition of the disciplinary probation.

Defendant University of Cincinnati is a public university created by the Ohio legislature.

Defendant Daniel Cummins is UC's Assistant Dean of Students and Director of the Office of University Judicial affairs. Cummins is allegedly responsible for administrating the Student Code of Conduct and Judicial System. Plaintiffs sue Cummins in his official capacity for declaratory and injunctive relief and in his personal capacity for damages.

Defendant Debra Merchant is UC's Vice President of Student Affairs. Merchant is also allegedly responsible for administrating the Student Code of Conduct and Judicial System. Plaintiffs sue Merchant in her official capacity for declaratory and injunctive relief and in her personal capacity for damages.

Defendant Denine Rocco is an assistant Vice President and Dean of Students for UC. Rocco is allegedly responsible for administrating the Student Code of Conduct and Judicial System. Plaintiffs sue Rocco in her official capacity for declaratory and injunctive relief and in her personal capacity for damages.

## B. The Claims

Count I seeks a declaratory judgment under 42 U.S.C. § 1983 that Defendants violated Plaintiffs' right to due process under both the federal and state constitutions with the procedures employed during their ARC hearings.

Count II is a claim for money damages pursuant to 42 U.S.C. § 1983 against Defendants Cummins, Merchant, and Rocco in their individual capacities for allegedly violating Plaintiffs' right to due process.

Count III seeks a declaratory judgment that UC violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., because Plaintiffs' gender was a motivating factor in the manner in which the allegations against them were investigated and adjudicated, and in the discipline they received.

11

Count IV seeks money damages against UC for its alleged violations of Title IX.

Count V seeks an injunction against Cummins, Merchant, and Rocco in their official capacities which would prohibit them from imposing or reporting any disciplinary action taken against Plaintiffs under the Student Code of Conduct.

### III.  Defendants' Motion to Dismiss

Defendants now move to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Defendants contend that Plaintiffs' claim for a declaratory judgment in Count I is barred by Eleventh Amendment sovereign immunity.  Defendants contend that Doe II's claims in Counts I, III, and V are barred on res judicata grounds. Defendants argue that Counts I and II fail to state claims for relief essentially because the complaint indicates that Plaintiffs received all of the process to which they were entitled.  Defendants also argue that the individual defendants are entitled to qualified immunity as to the claims against them in their individual capacities. Defendants contend that Plaintiffs' Title IX claims in Counts III and IV should be dismissed because the complaint does not allege facts showing that Plaintiffs were discriminated against on the basis of gender.  Finally, Defendants argue that Count V should be dismissed because injunctive relief is not cognizable as a stand-alone claim.

Defendants' motion has been fully briefed and is ready for disposition.  The Court will address the issues in the order presented.

### A. Eleventh Amendment Sovereign Immunity

The Eleventh Amendment bars suits for money damages against States, arms of the State, and state employees in their official capacities.  Rodgers v. Banks, 344 F.3d 587, 594 (6th Cir. 2003).  The Eleventh Amendment also bars suits for declaratory relief against

12

the State.  McCormick v. Miami Univ., 693 F.3d 654, 661 (6th Cir. 2012).  The University of Cincinnati is a public university, and, therefore, is considered an arm of the State of Ohio.  Johnson v. University of Cincinnati, 215 F.3d 561, 571 (6th Cir. 2000). Consequently, the Eleventh Amendment bars Plaintiffs' claim for declaratory relief against UC and the individual Defendants in their official capacities.  See id.  The Eleventh Amendment, however, does not bar Plaintiffs' claim for declaratory relief against the individual Defendants in their personal capacities.  Id.

Accordingly, to the extent that Count I seeks declaratory relief against UC and the individual Defendants in their official capacities, Defendants' motion to dismiss will be granted.  Defendants, however, are not entitled to dismissal of Count I on Eleventh Amendment grounds to the extent it seeks declaratory relief against the individual Defendants in their personal capacities.

## B. Res Judicata

Doe I and Doe II filed substantially the same complaint with the same causes of action against UC and Defendant Cummins in the Hamilton County Court of Common Pleas in January 2015.  Doc. No. 11-1.  Defendants in that case moved to dismiss Doe II's claims under Counts I, III and V on the grounds of mootness because he had graduated from UC and thus was no longer subject to the Student Code of Conduct.  Doc. No. 11-3. In February 2015, Judge Dinkelacker entered an order granting Defendants' motion to dismiss Counts I, III, and V of Doe II's complaint.  Judge Dinkelacker agreed with Defendants that Doe II's graduation from law school mooted his claims and that he otherwise had only pled speculative future consequences resulting from the disciplinary

13

proceedings. Accordingly, Judge Dinkelacker dismissed Counts I, III, and V of Doe II's complaint. Doc. No. 11-2.

In their present motion to dismiss, Defendants argue that Judge Dinkelacker's dismissal of Doe II's Counts I, III, V in state court operates as res judicata, and more specifically, issue preclusion, against the same claims in this case. In opposition, Plaintiff contends that the parties later entered into a stipulation to dismiss Doe II's state court complaint without prejudice. See Doc. No. 14, at 22-24 (citing attached Exhibit A (stipulation of dismissal and judgment entry granting dismissal without prejudice)).[2] Then, confusingly, in their reply brief Defendants agree that Judge Dinkelacker's entry of dismissal *does not* have res judicata effect in this case (Doc. No. 15, at 5), but they then ask the Court to adopt his reasoning and conclude that Doe II's claims in Counts I, III, and V are moot due to his graduation. Id.

Defendants have now apparently waived their res judicata argument. Defendants' argument in their reply brief that Doe II's Counts I, III, and V are moot, as opposed to barred by issue preclusion, is new. A party is generally not permitted to raise new arguments in its reply brief. Engineering & Mfg. Services, LLC v. Ashton, 387 Fed. Appx. 575, 583 (6th Cir. 2010). On the other hand, federal courts lack subject matter jurisdiction to adjudicate moot claims, Church of Scientology of Cal. v. United States, 506 U.S. 9, 12

---

[2] The Court notes that Exhibit A submitted by Plaintiffs are state court docket entries showing dismissal of *Doe I*'s claims without prejudice. However, review of the state court docket also reflects entries dismissing Doe II's claims without prejudice. See http://www.courtclerk.org/case_summary.asp?sec=history&casenumber=A1406907 (visited February 11, 2016); Armengau v. Cline, Fed. Appx. 336, 344 (6th Cir. 2001)(court may take judicial notice of public records in considering a Rule 12(b) motion).

(1992), and courts may sua sponte raise the question of their own subject matter jurisdiction. Ford v. Hamilton Inv., Inc., 429 F.3d 255, 257 (6th Cir. 1994).

The Court, however, is not persuaded that Doe II's graduation from UC renders his claims in Counts I, III, and V moot. In Yoder v. University of Louisville, 526 Fed. Appx. 537 (6th Cir. 2013), the Court held that the plaintiff's graduation from nursing school mooted her claim for injunctive relief in the form of reinstatement to the school. Id. at 543. The Court, however, went on to consider the plaintiff's legal claim that the individual defendants violated her right to due process when they originally dismissed the plaintiff from school for academic reasons. The Court also considered whether defendants were entitled to qualified immunity on that claim Id. at 549-50. In other words, implicit in Yoder is the conclusion that the plaintiff's graduation from school does not moot a claim for a past due process violation.

In this case, Doe II is not seeking reinstatement as a form of injunctive relief. Consequently, there is no question of mootness of his claims in that regard. Expungement of Doe II's disciplinary record, which is a claim suggested in his claim for injunctive relief, would not be moot as a result of his graduation. Flint v. Dennison, 488 F.3d 816, 825 (9th Cir. 2007). Yoder indicates that Doe II's graduation does not moot a claim against the individual defendants for damages for alleged past due process violations. Similarly, Doe II's graduation does not moot his Title IX claims for alleged past gender discrimination.

Accordingly, the Court concludes that Doe II's graduation from UC does not moot any of his claims.

15

## C. Rule 12(b)(6) Standard of Review

A motion to dismiss for failure to state a claim operates to test the sufficiency of the complaint.  The court must construe the complaint in the light most favorable to Plaintiff, and accept as true all well-pleaded factual allegations.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983).  The court need not accept as true legal conclusions or unwarranted factual inferences.  Lewis v. ACB Business Servs., Inc., 135 F.3d 389, 405 (6th Cir. 1998).

The complaint, however, must contain more than labels, conclusions, and formulaic recitations of the elements of the claim.  Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The factual allegations of the complaint must be sufficient to raise the right to relief above the speculative level.  Id.  Nevertheless, the complaint is still only required to contain a short, plain statement of the claim indicating that the pleader is entitled to relief.  Id. (citing Erickson v. Pardus, 551 U.S. 89, 93 (2007)).  Specific facts are not necessary and the pleader is only required to give fair notice of the claim and the grounds upon which it rests. Id.  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  Mere conclusions, however, are not entitled to the assumption of truth.  Id. at 678-89.  A claim is facially plausible if it contains content which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id. at 678.  Plausibility is not the same as probability, but the complaint must plead more than a possibility that the defendant has acted

16

unlawfully. <u>Id.</u> If the complaint pleads conduct which is only consistent with the defendant's liability, it fails to state a plausible claim for relief. <u>Id.</u>

### D. <u>Alleged Due Process Violations</u>

Defendants argue that Counts I and II fail to state claims for due process violations. Count I alleges that Defendants violated Plaintiffs' right to due process in the following ways:

1. conducting biased investigations, the results of which were provided to ARC hearing panels.

2. using hearsay evidence in ARC hearings without an effective opportunity for cross-examination.

3. hearing impact statements from alleged victims before an adjudication of guilt.

4. failure to apply UC's Title IX policies and legal terms correctly.

5. failure to permit effective cross-examination of witnesses.

6. denial of effective assistance of an attorney or advisor.

7. failure to afford them the presumption of innocence.

8. pre-judging the outcome of their hearings.[3]

Complaint ¶ 132.

Defendants contend that in the context of student disciplinary actions, due process only requires notice of the charges, an explanation of the evidence supporting the charges,

---

[3] Regarding this last allegation, the complaint actually states that Defendants violated Plaintiffs' right to due process because "An ARC Hearing Panel has never failed to recommend that a student be found responsible and significant discipline imposed." Complaint ¶ 132(h). The Court is unsure how the past results of other students' disciplinary hearings can by itself constitute a violation of Plaintiffs' due process rights. In the context of the entire complaint, however, the Court interprets this allegation to mean that Plaintiffs received a hearing in name only and that outcome of their hearings was a foregone conclusion.

and an opportunity to respond. Defendants argue that Plaintiffs received these minimum protections in this case. Additionally, Defendants cite cases indicating that assigning the burden of proof to the accused student does not violate due process, that students are not entitled to representation, that students are not entitled to direct cross-examination of witnesses, that students are not entitled to discovery and other procedural protections required in criminal proceedings, that Plaintiffs had more than adequate time to prepare for their hearings, and that Plaintiffs' mere allegations of bias are insufficient to show that their hearings were unfair.

Plaintiffs, however, argue that in determining whether they were afforded due process, it is improper to break down UC's process into its constituent parts, compare them to a checklist of procedures, and conclude that they were afforded adequate due process in their disciplinary proceedings. Plaintiffs contend, rather, that the Court must examine UC's process in a holistic manner to determine whether their right to due process was protected. Plaintiffs argue that on the whole UC's disciplinary procedures did not provide them adequate due process.

A student faced with expulsion or other discipline for violating school rules is entitled to due process before he can be deprived of his interest in continuing his education. There are, however, no precise parameters for the amount of process the student is due before the discipline can be imposed. The minimum requirements are that the student "must be given *some* kind of notice and afforded *some* kind of hearing." Goss v. Lopez, 419 U.S. 565, 579 (1975) (emphasis on original). This generally means that the student must be provided an explanation of the evidence against him and an opportunity to present his side of the story. Id. at 581. Beyond that, "[t]he type of notice and hearing will vary and be

18

judged for sufficiency based on context in which the dispute arose." Flaim v. Medical College of Ohio, 418 F.3d 629, 634 (6th Cir. 2005).  It is clear, nevertheless, that schools are not required to employ procedures used in criminal trials in order to satisfy due process. Id. at 635, 635 n.1.  While Plaintiffs contend that the Court must view the adequacy of UC's procedures as a whole, the Court notes for instance that in Flaim the Court of Appeals addressed the alleged procedural defects in the disciplinary hearing seriatim and then assessed the benefits the additional procedures would supposedly provide in reducing the risk of an erroneous expulsion versus the additional burdens it would impose on the school to provide them. Id. at 643.  Moreover, if the case law shows that Plaintiffs were not entitled to various procedural protections on an individual basis - and it does - then it follows that Plaintiffs were not denied due process because UC did not utilize some vague admixture of the missing procedures during their hearings.[4]

The Court concludes that to the extent that Plaintiffs base their due process claims on alleged defects in their first hearings, those alleged errors were harmless because their appeals were sustained and they both received new hearings. Cf. Harper v. Lee, 938 F.2d 104, 105-06 (8th Cir. 1991) (administrative reversal and grant of new disciplinary hearing preserved inmate's due process rights and cured any procedural defects in the first hearing).  Accordingly, the Court focuses its due process analysis on Plaintiffs' second hearings.  It is nevertheless useful to compare the alleged procedural defects of Plaintiffs'

---

[4] For instance, suppose that UC does not permit any cross-examination at all, but does allow each student to be represented by counsel.  Does the addition of counsel offset the loss of the ability to cross-examine witnesses in Plaintiffs' due process calculus?  What if UC were to deny cross-examination, but exclude hearsay?  Under Plaintiffs' holistic theory of procedural due process, there would be almost no way that UC could anticipate whether its disciplinary hearing procedures comport with due process.

first hearings with their second hearings because the absence of allegations that the same or similar defects occurred during the second hearings suggests that these alleged errors were not repeated. For instance, Doe I alleges that during his first hearing the ARC panel would not accept his evidence, such as the surveillance videos, text messages between Roe I and Roe II, and the rape kit analysis and SANE examinations. Complaint ¶ 71. Doe I, however, does not allege that the panel would not accept this evidence in his second hearing. See Complaint ¶ 78. The Court infers, therefore, that Doe I was permitted to present this evidence at the second hearing.

Plaintiffs allege that UC was biased against them and that the ARC panel members were pre-disposed to finding them responsible for the alleged misconduct. The complaint places particular emphasis on pressure allegedly exerted on UC and other universities by the Department of Education to find students accused of sexual misconduct guilty under a threat of a federal investigation and the withholding of federal funding. The complaint also cites training materials that allegedly presume that sexual assault complainants are truthful and that elevate the rights of the complainants over the due process rights of the accused. In this way, the complaint suggests, ARC hearing members are inculcated to find a student accused of sexual misconduct guilty.

School disciplinary boards must of course be impartial, Heyne v. Metropolitan Nashville Pub. Sch., 655 F.3d 556, 567 (6th Cir. 2011), but they are entitled to a presumption of honesty and impartiality absent a showing of actual bias. Atria v. Vanderbilt Univ., 142 Fed. Appx. 246, 256 (6th Cir. 2005). Generally, the alleged bias of the disciplinary board must be evident from the record and not based on inference and speculation. Nash v. Auburn Univ., 812 F.2d 655, 665 (11th Cir. 1987). A plaintiff must

allege facts sufficient to overcome this presumption, such as statements by board members or university officials indicating bias or a pattern of decision-making suggesting that gender was an influence.  Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 251 (2nd Cir. 1995).  Thus, for instance, in Gomes v. University of Maine Sys., 365 F. Supp.2d 6, 31-32 (D.Me. 2005), the fact that the hearing board chair participated in sexual assault victim advocacy programs did not demonstrate that she was biased against the plaintiff in his sexual misconduct disciplinary hearing.  As the district court sharply observed in that case, "There is not exactly a constituency in favor of sexual assault, and it is difficult to imagine a proper member of the Hearing Committee not firmly against it. It is another matter altogether to assert that, because someone is against sexual assault, she would be unable to be a fair and neutral judge as to whether a sexual assault had happened in the first place."  Id.

Similarly, Plaintiffs' allegations concerning the sexual assault training provided to UC staff members and pressure allegedly exerted on universities by the Department of Education to intensify their response to sexual assault complaints fall short of creating a reasonable inference that the ARC panels in Plaintiffs' cases were biased.  It should be a laudable goal for a university to raise the awareness of its faculty and staff to sexual assault and to increase their sensitivity to the particular problems that victims of sexual violence experience in coming forward to make complaints.  Plaintiffs do not cite any authority for the repeated implication in their complaint that a university must balance its sexual assault training with training on the due process rights of the accused in order to avoid a claim that its disciplinary procedures are biased.  Moreover, it is not reasonable to infer that UC has a practice of railroading students accused of sexual misconduct simply to appease the

Department of Education and preserve its federal funding.[5]   Plaintiffs' mere belief that Defendants acted with such ulterior motives[6] is insufficient to state a claim for relief.  Center for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 377 (6th Cir. 2011)("These vague and conclusory allegations of nefarious intent and motivation by officials at the highest levels of the federal government are not well-pleaded, and are therefore insufficient to 'plausibly suggest an entitlement to relief.'");  Moss v. U.S. Secret Serv., 572 F.3d 962, 970 (9th Cir.2009) ("The bald allegation of impermissible motive. . .  standing alone, is conclusory and is therefore not entitled to an assumption of truth."). Finally, Plaintiffs' statistical allegations, discussed further below, do not reasonably reflect a pattern of decision-making indicative of bias against men.

Plaintiffs next complain that UC permitted the use of hearsay evidence without providing an opportunity for an effective cross-examination of the witness.  There is, however, no prohibition against the use of hearsay evidence in school disciplinary hearings. Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 926 (6th Cir. 1988).  And, given that there is no general due process right to cross-examine witnesses in school disciplinary hearings, Flaim, 418 F.3d at 641, it follows that Defendants in this case did not violate Plaintiffs due process rights by accepting hearsay evidence without permitting Plaintiffs to "effectively" cross-examine the witness.  It is important to note that Plaintiffs do

---

[5] The Court specifically declines to follow Wells v. Xavier Univ., 7 F. Supp.2d 746 (S.D. Ohio 2014).  In that case, the district court concluded that the mere allegation that the university allowed a defective hearing to go forward in order to demonstrate to the Department of Education that it was taking sexual assault complaints seriously stated a Title IX violation. Id.  That decision seems contrary to Twombly and Iqbal's admonition that conclusory allegations are insufficient to state a claim for relief.

[6] See, e.g., Complaint ¶¶ 34, 35, 111(a)

not allege that Defendants prevented them from cross-examining the hearsay witness at all, they have not indicated in their complaint the nature of the hearsay evidence presented, and they failed to explain how additional cross-examination of the hearsay witness would have lowered the risk that they would have been erroneously disciplined.

Plaintiffs next assert that the ARC Panel erred by accepting victim impact statements before finding that they had violated the Student Code of Conduct.  This is essentially an attack on the type of evidence the panel elected to admit.  School disciplinary boards, however, are not bound by formal rules of evidence or rules of criminal procedure.  Flaim, 418 F.3d at 635.  Moreover, the Court's own research has not discovered any cases indicating that a disciplinary board is restrained from the types of evidence it may consider or in the order or mode of the presentation of evidence.  Thus,  in this case, Plaintiffs fail to state a claim for a due process violation based the ARC Panel's decision to hear victim impact statements before adjudicating Plaintiffs responsible for violating the Student Code of Conduct.  Bifurcating the proceedings into different phases, such as a guilt phase and a punishment phase, adds more layers of complexity, and thus more time and expense, to the disciplinary process.  Plaintiffs' brief does not explain how a requirement to bifurcate the procedures, as is implicit in this claim, would reduce the probability that they would have been erroneously disciplined.  Again, school disciplinary proceedings are not required to adopt all of the formalities of a criminal trial.  Id. at 640 ("Full-scale adversarial hearings in school disciplinary proceedings have never been required by the Due Process Clause[.]"); Gorman v. University of R.I., 837 F.2d 7, 16 (1st Cir. 1988)("[O]n review, the courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law criminal trial.").

Plaintiffs next complain that the ARC Panel applied the Student Code of Conduct improperly. In particular, Plaintiffs contend that the Panel applied the definition of consent improperly. However, an allegation that the disciplinary board violated its own policies and procedures does not state a claim for a due process violation. Heyne v. Metropolitan Nashville Pub. Sch., 655 F.3d 556, 569 (6th Cir. 2011); Webb v. McCullough, 828 F.2d 1151, 1159 (6th Cir. 1987); see also Levitt v. University of Tex. at El Paso, 759 F.2d 1224, 1230 (5th Cir. 1985)("There is not a violation of due process every time a university or other government entity violates its own rules."). Moreover, as a general principle, federal courts must defer to a state agency's interpretation of its own rules and regulations absent a compelling demonstration that it is wrong. Smith v. Babcock, 419 F.3d 257, 260-61 (6th Cir. 1994). In this case, Plaintiffs' bare allegations that the ARC Panel misinterpreted the Student Code of Conduct are insufficient to state a due process violation.

Next, Plaintiffs complain that they were denied an effective opportunity to cross-examine witnesses because they had to submit their questions to the ARC Panel chair in written form and had no opportunity to ask follow-up questions. Inasmuch as students do not have a general right to cross-examine adverse witnesses in school disciplinary proceedings, see supra at 22-23, it follows that Plaintiffs' due process rights were not violated because they were required to submit written questions to the panel chair. Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) (no due process violation where students were able to submit written questions to hearing officer to ask witness).

Plaintiffs next assert that they were denied effective assistance of an attorney or advisor. Plaintiffs, however, were entitled to the assistance of an attorney only if the ARC Panel presented its case through an attorney or the rules governing the hearing were

24

unusually complex. Flaim, 418 F.3d at 640. Plaintiffs do not allege that Defendants presented their case with the assistance of an attorney or that the rules were unusually complex. It follows, therefore, that if Plaintiffs were not entitled to the assistance of an attorney, they were not denied effective assistance of an advocate because their advisors were not permitted to participate in the hearing.

Plaintiffs next allege that Defendants violated their right to due process by failing to give them the presumption of innocence and by failing to assign the burden of proving a violation of the Code of Conduct to the complaining student. The facts alleged in the complaint show that the ARC Panel functioned as a board of inquiry and determined what happened based on a preponderance of the evidence without assigning the burden of proof to either party. Complaint ¶ 31(f). Nevertheless, even assuming that the ARC Panel placed the burden of proof on Plaintiffs as they claim, they have not stated a due process violation. As Defendants correctly argue in their brief, "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." Lavine v. Milne, 424 U.S. 577, 585 (1976).

Finally, Plaintiffs allege that an ARC Panel has never found a student not responsible for a violation of the Student Code of Conduct. Plaintiffs, however, have not explained how the results of prior ARC Panel hearings involving different students can constitute a violation of their due process rights in their respective hearings. Neither can the Court conceive of an argument that would lead to such a conclusion. To the extent that this constitutes a stand-alone claim for a due process violation, it fails as a matter of law.

In summary, Plaintiffs' complaint indicates that they were charged with violations of the Student Code of Conduct. They received notice of the charges. Even if Plaintiffs' first

hearings were riddled with procedural errors as they claim, they both appealed and were granted new hearings. Thus, any due process violations from the first hearings were cured. During their second hearings, Plaintiffs were able to present their own evidence and version of the events. They were not permitted assistance of counsel but the ARC Panel did not utilize an attorney to present its case either. Plaintiffs were able to submit written questions to witnesses in lieu of direct cross-examination. Thus, Plaintiffs' complaint, viewed against the backdrop of existing case law on student disciplinary hearings, shows that they received all the process that they were due. Although not specifically stated in their complaint, Plaintiffs clearly believe that they were entitled to all of the procedural protections of a criminal trial. As already stated, however, universities are not required to conduct disciplinary proceedings like criminal trials in order to satisfy the Due Process Clause. Although providing Plaintiffs in this case with additional procedural safeguards might have been preferable, "[t]he Due Process Clause . . . sets only the floor or lowest level of procedures acceptable." Flaim, 418 F.3d at 636. Plaintiffs' complaint shows that the procedures used in their disciplinary hearings met the minimum requirements of due process. Accordingly, Defendants are entitled to dismissal of Plaintiffs' due process claims.

### D. Qualified Immunity

Even if the Court were to conclude that the complaint states claims for violations of the Due Process Clause, the factual allegations show that the individual Defendants are entitled to qualified immunity from suit on these claims.

A public official is entitled to qualified immunity and thus shielded from suit under § 1983, for his actions if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known. Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982). The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). The official, however, is only entitled to qualified immunity for actions taken in objective good faith within the scope of his duties. <u>Id.</u> at 849 n.34.

Determining a public official's entitlement to qualified immunity presents a two-step inquiry. First, the court must determine, judged in the light most favorable to the party asserting the injury, whether the facts alleged show that the officer's conduct violated a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). If no constitutional right would have been violated on the facts alleged, the inquiry stops and the officer will be entitled to qualified immunity. <u>Id.</u> If a violation can be made out based on a favorable view of the pleadings, the court must determine whether the right at stake was clearly established. <u>Id.</u>

In determining whether a constitutional right is clearly established, the court must find binding decisions from the U.S. Supreme Court, the Sixth Circuit Court of Appeals, or finally, decisions of other circuit courts. <u>Walton v. City of Southfield</u>, 995 F.2d 1331, 1336 (6th Cir. 1993) (citing <u>Daugherty v. Campbell</u>, 935 F.2d 780, 784 (6th Cir. 1991)); <u>Summar v. Bennett</u>, 157 F.3d 1054, 1058 (6th Cir.1998). It is only the extraordinary case that will require a reviewing court to look beyond Supreme Court and Sixth Circuit decisions. <u>Walton</u>, 995 F.3d at 1336. The questions of whether the right alleged to have been violated is clearly established and whether the official reasonably could have believed that his conduct was consistent with the right the plaintiff claims was violated, are ones of law for the court. <u>Id.</u> However, if genuine issues of material fact exist as to whether the official

27

committed the acts that would violate a clearly established right, then dismissal of the claim is improper.  Id.; see also Jackson v. Hoylman, 933 F.2d 401, 403 (6th Cir. 1991) (affirming district court's denial of summary judgment on the issue of qualified immunity where the parties' factual account of the incident differed).

When a defendant raises qualified immunity as a defense, as the Defendants have done in this case, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.  Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009).

In this case, although as a general rule it was clearly established that students are entitled to due process before they can be expelled from school, it has not been clearly established that Plaintiffs were entitled to all of the procedural protections they claim were missing from their disciplinary hearings.  In fact, the case law generally points the other way - it was clearly established that Plaintiffs were not entitled to the individual procedural protections they claim.

As Flaim indicates, Plaintiffs were not entitled to the assistance of counsel or an advisor nor were they entitled to cross-examine witnesses.[7]  It was not clearly established that Plaintiffs were entitled to the presumption of innocence.  Similarly, it was not clearly established that Plaintiffs could not be assigned the burden of proof.  Lavine, rather, clearly establishes that assignment of the burden of proof in non-criminal matters does not even implicate the Constitution.  It was not clearly established that school boards cannot rely on

---

[7]     Flaim states that due process might require the right to cross-examine a witness where credibility is an important issue.  Although credibility of witnesses was clearly an issue in Plaintiffs' disciplinary hearings, no case from the U.S. Supreme Court or the Sixth Circuit has clearly established the right to cross-examine witnesses even where credibility is an issue.  Flaim, therefore, does not clearly establish the right to cross-examine witnesses in cases like Plaintiffs'.

hearsay evidence in disciplinary hearings. Again, the opposite is true - rules of evidence do not apply and hearsay is acceptable. It was not clearly established that school boards are restricted in the modes and order of presentation of evidence. The opposite is again true - disciplinary boards are not bound by any particular rules of procedure. Considered as a whole, and in light of the applicable case law, a reasonable public official in the position of the individual Defendants would not have known that the procedures used in Plaintiffs' disciplinary hearings violated their due process rights. Accordingly, Defendants are entitled to qualified immunity on Plaintiffs' due process claims.

## E. Title IX

Plaintiffs both claim that UC discriminated against them on the basis of gender in violation of Title IX of the Education Amendments of 1972. Title IX prohibits educational institutions that receive federal funds from discriminating against students on the basis of gender. 20 U.S.C. § 1681(a).

Title IX discrimination claims apparently may be sorted into four broad categories: "erroneous outcome," "selective enforcement," "deliberate indifference," and "archaic assumptions." Mallory v. Ohio Univ., 76 Fed. Appx. 634, 638-39 (6th Cir. 2003). In an "erroneous outcome" case, the plaintiff contends that the outcome of the disciplinary proceeding was erroneous due to gender bias. Id. at 639. In a "selective enforcement case," the plaintiff alleges that the university treated a similarly-situated member of the opposite sex more favorably than the plaintiff. Id. at 640. In a "deliberate indifference" case, the plaintiff alleges that a university official who had authority to implement corrective measures had actual notice of but was deliberately indifferent to misconduct directed at the plaintiff. Id. A "deliberate indifference" claim seems for the most part to be limited to sexual

29

harassment cases. See id. (stating that the "deliberate indifference" standard applies where the plaintiff seeks to hold the university liable for sexual harassment); Doe v. University of the South, 687 F. Supp.2d 744, 757-58 (E.D.Tenn. 2009) ("The 'deliberate indifference' must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."); but see Wells v. Xavier Univ., 7 F. Supp.3d 746, 751-52 (S.D. Ohio 2014) (Spiegel, J.) (holding that plaintiff stated a Title IX deliberate indifference claim based on allegations that university permitted disciplinary hearing to go forward despite being aware that claims that plaintiff sexually assaulted student were unfounded). Finally, in an "archaic assumptions" case, the plaintiff contends that the university's actions were founded on archaic assumptions about men and women. Sterrett v. Cowan, 85 F. Supp.3d 916, 936 (E.D.Mich. 2015).

Plaintiffs' complaint touches on all of these Title IX sub-categories, but this appears principally to be an "erroneous outcome" case. The complaint is dominated with allegations that UC's disciplinary process, at least in cases of allegations of sexual misconduct, is driven by outside influences and training that biases the system against males accused of sexual assault and in favor of women complainants. But, under any theory, Plaintiffs must still allege facts sufficient to conclude that UC's conduct was motivated by gender bias. Mallory, 76 Fed. Appx. at 638. The Court concludes that Plaintiffs have not alleged facts showing that the results of their disciplinary proceedings were motivated by gender bias. Rather, at worst UC's actions were biased in favor of alleged victims of sexual assault and against students accused of sexual assault. However, this is not the same as gender bias because sexual assault victims can be either male or female. Sahm v. Miami Univ., 110 F. Supp.3d 774, 778-79 (S.D. Ohio 2015)(Dlott, J.).

30

First, many of the actions taken by UC which Plaintiffs claim are indicative of gender bias complied with Title IX guidance issued by the Department of Education. For instance, Plaintiffs complain that the Jane Roes were given accommodations for their class schedules and assignments. Plaintiffs also complain that UC barred them from accessing certain campus buildings during the pendency of their hearings. But, as UC points out, federal regulations and Title IX guidance indicates that UC was required to take those interim measures once it received notice of the complaints from the Jane Does. See 34 C.F.R. § 668.46(b)(11)(v); see also United States Department of Education, Questions and Answers on Title IX and Sexual Violence, at 32 (Apr. 29, 2014) ("The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working activities as appropriate.") available at www2.ed.gov/about/offices/list/ocr/ docs/qa-201404-title-ix.pdf (visited Feb. 24, 2106). In other words, actions taken by UC to comply with guidance to implement Title IX cannot have been in violation of Title IX.

Second, Plaintiffs' complaint alleges, in a conclusory fashion, that many of UC's alleged due process violations, such as the rule not permitting cross-examination and the denial of the right to counsel or an advisor, are the result of gender bias. In Yu v. Vassar College, 97 F. Supp.3d 448, 460-81 (S.D.N.Y. 2015), the district judge thoroughly dissected most if not all of these kinds of claims and concluded that the plaintiff failed to show how the alleged procedural errors were motivated by gender bias. Similarly, in this case, Plaintiffs' complaint does not, for instance, allege facts linking UC's decision to limit cross-examination to gender bias. Consequently, the complaint fails to create a reasonable

31

inference that the disciplinary hearing procedures adopted by UC were motivated by a desire to discriminate against male students.

Third, Plaintiffs' complaint cites statistics which purport to show that UC discriminates against males in investigating and imposing discipline for sexual misconduct. Specifically, according to the complaint, the statistics show that only males have been investigated and disciplined for sexual misconduct by UC.  These statistics, however, fail to show that UC has a pattern or practice of discriminating against males in sexual misconduct cases.  In order for the statistical evidence to be meaningful, it must eliminate the most likely non-discriminatory reason for the disparity.  Bender v. Hecht's Dept. Stores, 455 F.3d 612, 622 (6th Cir. 2006).  There are, however, at least two related non-discriminatory reasons for the disparity between males and females in sexual misconduct disciplinary cases: 1) UC has only received complaints of male-on-female sexual assault;[8] and 2) males are less likely than females to report sexual assaults.[9]  See Complaint ¶¶ 119, 120.  Plaintiffs statistics do not eliminate or attempt to account for these reasons and, consequently, do not tend to show that UC's disciplinary system discriminates against males in cases involving sexual misconduct.  Moreover, since recovery under Title IX under

---

[8] Paragraph 119 of the complaint recites that publicly available records show that since 2011, UC has investigated nine cases of sexual assault.  In all nine cases, the respondent, or accused, was male.  The gender of complainant, or alleged victim, could only be identified in eight of the cases. In all eight of those cases, the complainant was female. Paragraph 120 of the complaint recites national statistics indicating that males are victims of sexual assault at roughly the same prevalence as women and speculates that UC should have investigated more cases involving male victims of sexual assault than it actually has.

[9] Loree Cook-Daniels, Female Perpetrators and Male Victims of Sexual Assault: Why They Are So Invisible (2011) (reporting that "male sexual assault victims are far less likely than female sexual assault victims to report the crime against them"), available for download through a title search at forge-forward.org (visited Feb. 19, 2016).

a disparate impact theory is not permitted, Plaintiffs' cannot state a claim by alleging that UC's otherwise gender-neutral disciplinary procedures disproportionately affect men. Horner v. Kentucky High Sch. Ath. Ass'n, 206 F.3d 685, 692 (6th Cir. 2000).

Yusaf v. Vassar College, 35 F.3d 709, 716 (2nd Cir. 1994), held that the plaintiff's allegation that "males invariably lose when charged with sexual harassment at Vassar" was sufficient on a Rule 12(b)(6) motion to link the outcome of the plaintiff's disciplinary hearing to gender discrimination. Plaintiffs in this case makes the same allegation - males charged with sexual misconduct invariably are found responsible for the violation. The Court, however, concludes that this bare allegation is insufficient to plausibly infer that the results of Plaintiffs' disciplinary hearings were affected by gender discrimination. First, as already discussed, the statistical evidence cited by Plaintiff does not eliminate other likely causes for the disparity between males and females in disciplinary cases. Second, and relatedly, Yusaf disregarded the issues of sample size and whether the alleged disparity in treatment between men and women was statistically significant , id., which is contrary to Sixth Circuit case law. Bender, 455 F.3d at 612; Barnes v. GenCorp, Inc., 896 F.2d 1457, 1466 (6th Cir. 1990). Third, and importantly, as UC correctly points out, Plaintiffs' own complaint demonstrates that males are not invariably found responsible when charged with sexual misconduct violations - the ARC panel acquitted Doe I of the charge related to Jane Roe I. Accordingly, for all of those reasons, Plaintiffs' allegation that males invariably lose in sexual misconduct disciplinary hearings is insufficient to plausibly infer gender discrimination affected their hearings.

In summary, the facts alleged in the complaint, even accepted as being true, do not create a plausible inference that UC discriminated against Plaintiffs on the basis of gender

33

in violation of Title IX in their respective disciplinary hearings.  Accordingly, UC is entitled

to dismissal of Plaintiffs' Title IX claims.

Conclusion

For the reasons stated above, Defendants' motion to dismiss is well-taken and is

**GRANTED.**  The complaint is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**

Date March 23, 2016                              s/Sandra S. Beckwith
                                                Sandra S. Beckwith
                                  Senior United States District Judge